UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20447-CR-SINGHAL

UNITED STATES OF AMERICA

vs.

JASON VAN EMAN,

    Defendant.
_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**

The United States of America hereby responds to Defendant's Sentencing Memorandum and Request for Downward Variance ([ECF No. 347]). Before the Court considers the lawyers' views of Defendant and his crimes, it should listen closely to what the victims of this fraud have to say:

> I can rehash and rephrase all of the professional and financial losses from Mr. Van Eman's actions over and over, but **it is the personal impact and devastation to our family that's irreparably broken**. **This butterfly effect would not have happened if not for Jason Van Eman's actions**. Given this on top of Mr. Van Eman's **lack of remorse and attempted diversion of any and all responsibility**, I humbly request the court to consider the strongest sentencing deemed appropriate.

July 15, 2022 Letter from Family of Victim "R.S." (emphasis added).

As former Broadway producer Laura Stanczyk wrote: "Jason Van Eman has shown no remorse and no pity to the people he has grossly wronged. He deserves none from the Court. He should not be allowed to move freely in a compassionate, civil society." July 14, 2022, Letter from Laura Stanczyk. At trial, the Court heard Ms. Stanczyk explain how Defendant's callous fraud destroyed her career. Her partner, Jack Viertel, wrote: "He has never expressed the slightest remorse or regret for any of this, and, in my view, deserves the maximum sentence allowed under

law, not only for the crimes of which he's been convicted, but for the incalculable human cost that resulted, which goes far beyond any financial loss." July 13, 2022, E-mail from Jack Viertel to Probation Officer. Mr. Viertel's brother, Tom, was also victimized by Defendant's "charade" (see PSI ¶ 83).

Victims Shona Tuckman and Stuart Benjamin submitted their own letters to the Court, explaining the trauma they suffered when Defendant destroyed their relationships, projects, and in Mr. Benjamin's case, his retirement savings. And these are just a handful of the dozens of victims Defendant hurt (see PSI ¶ 27). They are not billionaires with money to burn. They are honest, hardworking people who saw their reputations and professional dreams "turn to ashes" (PSI ¶ 87). As investors Dan and Linda Maloney wrote: "This kind of financial crime is rampant and growing. How will it ever be stopped or at least deterred, if the criminals are not held accountable?" (PSI ¶ 87).

And that is the question: should a remorseless fraudster receive compassion when he himself showed none? The Government submits he should not. Justice requires that Defendant receive a Guidelines sentence. He deserves no leniency.

## SENTENCING PRINCIPLES

## 18 U.S.C. § 3553(a)

After United States v. Booker, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." United

States v. Amedeo, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. See United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009).

## Punishment for White-Collar Criminals

The Eleventh Circuit has said "economic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus "prime candidate[s] for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress recognized "the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]" Martin, 455 F.3d at 1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Eleventh Circuit also observed that "[d]efendants in white collar crimes **often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment**." Martin, 455 F.3d at 1240 (emphasis added).

## THE STATUTORY FACTORS

The relevant Section 3553(a) factors demand a sentence within the Guidelines range of 262 to 327 months. Importantly, the Court should reject Defendant's attempts to minimize his conduct by comparing himself favorably to his partner, Benjamin McConley.

McConley's 13-year sentence was within his Guidelines range (McConley PSI [ECF No. 148] at ¶ 169). Defendant's is higher for two reasons: he (1) refused to admit guilt; and (2) took the stand and lied about it (PSI ¶¶ 93-99). Together, this conduct rightly results in a five-level increase under the Guidelines. See U.S.S.G. §§ 3E1.1, 3C1.1. And the Eleventh Circuit has long

held "that defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial." United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009) (citing United States v. Williams, 526 F.3d 1312, 1323-24 (11th Cir. 2008)). McConley pled guilty and attempted to cooperate. In plain terms, he received "a rebate" for taking responsibility. Defendant is not entitled to that. In fact, he lied about his guilt under oath. Accordingly, his punishment should be much greater. That is not a "trial tax." That is the law. See U.S.S.G. §§ 3E1.1, 3C1.1.

And under no circumstances should Defendant be allowed to compare himself to the least culpable co-defendant: an entry-level banker who took direction from Defendant and then testified against him. See 18 U.S.C. § 3553(a)(6) (discussing the need to avoid **unwarranted** sentence disparities among defendants with similar records who have been found guilty of **similar conduct**) (emphasis added). See also Docampo, 573 F.3d at 1101 ("On a practical level, it would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities and then cry foul when a coconspirator benefits from rendering substantial assistance to the government") (quoting United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005)). Moreover, Defendant's claims that Benjamin Rafael was sentenced (1) to only 30 months and (2) on the basis of a lesser loss amount are flat-out wrong (Def. Mem. at 7). Rafael was sentenced to a total of 42 months and his Guidelines were properly calculated using a loss amount of approximately $60 million (see Gov't Resp. [ECF No. 133] at 3, 5).

Defendant's sentence should therefore be in line with other Ponzi schemers. The Government respectfully requests that the Court consider the cases of:

- United States v. Nevin Shapiro, No. 2-10-cr-00471-001 (D.N.J. June 7, 2011) (following guilty plea, imposing and upward variance and sentencing to twenty years' imprisonment

a 42-year-old defendant who executed a Ponzi scheme based in South Florida between 2005 and 2009, which caused investor losses of over $82,000,000, and noting Shapiro, a compulsive gambler, spent lavishly during this time).

- United States v. Arthur Lamar Adams, No. 3:18-cr-00088-CWR-LRA (S.D. Miss. Nov. 8, 2018) (sentencing 58-year-old organizer and leader of approximately $165 million Ponzi scheme, involving approximately 200-300 investor victims, to 27 years' imprisonment following entry of guilty plea).

- United States v. Kevin Merrill, No. 1:18-cr-00465-RDB-1 (D. Md. Oct. 11, 2019) (sentencing 54-year-old organizer/leader of estimated $396 million Ponzi and fraud scheme to 22 years' imprisonment, following entry of guilty plea).

- United States v. Antonio Carlos De Godoy Buzaneli, No. 0:17-cr-00284-MJD-HB (D. Minn. Apr. 10, 2019) (following guilty plea, sentencing 57-year-old defendant living in South Florida who spearheaded an approximately $150 million Ponzi scheme involving Brazilian factoring, to 20 years' imprisonment, and to pay restitution of approximately $51 million).

- United States v. Raymond Montoya, No. 18-10225-GAO (D. Mass. Mar. 25, 2019 (sentencing 70-year-old defendant who spearheaded $38 million Ponzi scheme to 175 months' imprisonment following guilty plea, where guidelines range was 210-262 months).

- United States v. Lee Loomis, No. 12-cr-00315-JAM (E.D. Cal. Oct. 5, 2018) (following guilty plea, sentencing 60-year-old defendant who spearheaded approximately $10 million Ponzi scheme to 12 years' imprisonment, in case involving approximately 183 investor victims).

In formulating its sentencing recommendation, the United States has also collected post-trial sentences, which were imposed in white-collar cases in this District. Some of these cases involved less serious conduct, in terms of both duration and victim impact:

- United States v. Raoul Doekhie, et al., No. 18-20919-CR-Altman (S.D. Fla.) (imposing post-trial sentence of 220 months on three business partners who cheated U.S. manufacturers out of infant formula, eye-care products, and other FDA-regulated items worth more than $100 million).

- United States v. Leonard Bogdan, No. 05-14090-CR-Martinez (S.D. Fla.) (imposing post-trial sentence of 360 months on investment advisor who ripped off approximately 191 victims and caused losses of approximately $11.5 million).

- United States v. Darryl Burke, No. 13-20616-CR-Cohn (S.D. Fla.) (imposing post-trial sentence of 360 months for mortgage fraudster who caused approximately $7 million in losses to banks).

- United States v. Domenico Rabuffo, No. 14-20008-CR-Moore (S.D. Fla.) (imposing post-trial sentence of 327 months in $27 million mortgage fraud scheme).

**See also**:

- United States v. Robert Shapiro, No. 19-20178-CR-Altonaga (S.D. Fla.) (imposing post-plea sentence of 300 months for elderly real estate Ponzi schemer defrauded over 800 victims).

- United States v. Scott Rothstein, No. 09-60331-CR-Cohn (S.D. Fla.) (imposing post-plea (and post-cooperation) sentence of 600 months for wealthy attorney who orchestrated $1.2 billion Ponzi scheme involving bogus settlement agreements for over four years).

In sum, courts in this District routinely sentence Ponzi schemers and other sophisticated fraudsters to terms greater than twenty years based, in large part, on the losses suffered by the victims. The out-of-circuit case Defendant cites (Adelson) is inapposite. There, the Court specifically found that "Adelson only joined the conspiracy toward its end" and the jury acquitted Adelson of most of the charged conduct. United States v. Adelson, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006). Here, the jury saw that Defendant was instrumental in setting up and carrying out the scheme from its inception (see Gov't Resp. to Def. PSI Obj. [ECF No. 350] at 12-13, 17-18). The jury convicted him of every charged count. Unlike the defense's for-hire polygrapher, the jury knew he was lying. And there can be no serious debate about the financial impact of Defendant's crimes. Notably, the victims in this case were not banks (as in the mortgage fraud cases) or institutional investors. Indeed, many of the victims were independent filmmakers and

producers desperately seeking financing for their passion projects. Those victims' lives were ruined. And Marc Trottier, Laura Stanczyk, Tom Viertel, Stuart Benjamin, and Joshua Minyard all testified that they lost every cent of the tens of millions they provided to Defendant and his partner. Defendant will never pay them back. He can never make them whole. Under these and the following facts, a below-Guidelines sentence is not appropriate.

A.     **The nature and circumstances of the offenses.** See **18 U.S.C. § 3553(a)(1).**

Defendant's seven-year-long scheme resulted in at least $67,000,000.00 in victims' money being transferred to the schemers' accounts. This was a massive fraud—even by South Florida standards. And there was never a question that Defendant knew he was ripping off investors: in 2015, Defendant told McConley they owed over **$85.36 million** to the victims (Government Exhibits (GX) 1TRACK-5, 1TRACK-6). Defendant did not care. He has brazenly pretended since 2011 to be a film financier despite having no actual money. He used victim funds to pay for several homes, cars, lawyers, and foreign trips. He enjoyed other benefits, as well, including acting roles and the large "equity" positions he negotiated for himself in the films he financed with other victims' monies. And despite his lawyers' contentions, he burned large sums on meals, "personal expenses," and bad investments, including over $240,000 to a sham company called "Missouri Holdings Group." Again, Defendant had no other source of income apart from fraud.

At trial, the Court heard evidence that Defendant **personally** controlled over $20.5 million of the victims' money. That he chose to fund a handful of films is hardly noble. That is how a Ponzi scheme works—particularly in an industry where Defendant's victims often learned of him and his upstart production company through word of mouth. It was important for Defendant to finance a few small movies to maintain the appearance of legitimacy (and burnish his acting

resume). It allowed him to keep the scam going. It enabled him to attend film premieres on foreign mega-yachts while pretending to be a bigtime movie producer. For all the talk of McConley's "lavishness" in the defense case, the Court will recall seeing photographs of Defendant's rented villa in France, parties in Monte Carlo with gold-flaked champagne, and movie posters where Defendant's name was accompanied by the flashy title "Executive Producer."

That said, Defendant's motives are a secondary issue. The best evidence of the seriousness of this offense is the impact it had on the victims. As their trial testimony and impact statements show, they were devastated by this fraud (see PSI ¶¶ 82-89). The Guidelines range and the loss amount driving it accurately reflect (and likely understate) the seriousness of this offense.

### B. The history and characteristics of the Defendant. See 18 U.S.C. § 3553(a)(1).

Like nearly every defendant who comes before this Court, Defendant has a family that loves him. But Defendant was a husband, father, son, and brother during the time he was callously defrauding people. The victims had families, too; they suffered unimaginably because of Defendant's scheme. With respect to his own characteristics, Defendant once had a great deal of potential. He squandered the opportunity for a commission from the United States Air Force Academy—an honor reserved for the most extraordinary young Americans. By the time he moved to Hollywood to find fame and fortune, Defendant was a smart, charismatic, and handsome young actor with seemingly endless options. Yet, around 2011, he chose to become a fraudster (see, e.g., GX 1-404-9, 11, 13). Simply put: Defendant used his intelligence, charm, and good looks to rip people off. As the Court observed, Defendant was the point man on every bogus deal. The victims all testified that they went into business with WeatherVane, not Forrest Capital, and rarely had any dealings with McConley until things went south. In truth, Defendant was never a legitimate movie

producer or financier because he never had the actual money to do those things. Instead, he made up stories about his "family office;" a $45 billion insurance-backed funding source; Tiger Bonds; Tanzanian gold expeditions, etc. Eventually, he teamed up with another con artist (McConley). This fraud was not a lapse in judgment. In sum, Defendant's life has not been "exemplary" (Def. Mem. at 9). He has spent much of it lying and hurting people. Defendant's friends and family have tried to paint a picture of a godly man living a modest life in Bartlesville, Oklahoma. But none of them attended the trial. Victim (and fellow Bartlesville resident) Linda Maloney's words speak for themselves: "What are the odds that the person who swindled me would be someone from my own hometown[?]" (PSI ¶ 87).

Defendant's attempt to distinguish his conduct from McConley's based on their expenditures is wholly misguided. Defendant did not receive any legitimate income from 2013 through 2019; it was all obtained through fraud. That includes the money he received from investments in films he financed with stolen money. It would be similarly ludicrous to suggest that McConley came by his stock-trading profits honestly. Yet that is what Defendant is arguing. Relatedly, any monies Defendant purportedly donated to the Girl Scouts of the U.S.A. or his church were not his to give. As one Court noted:

> To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

United States v. McHan, 920 F.2d 244, 248 (4th Cir. 1990). Defendant is not Robin Hood; the Court should not consider these purported donations. The same is true of the millions Defendant sent to "projects" (see Def. Mem. at 6). Defendant should receive no "credit" or "discount" for,

essentially, robbing Peter to pay Paul. Defendant already took the credit for those movies. Now he must pay the consequences.

When evaluating Defendant's character the Court should also consider, as it did at McConley's sentencing, the duration, sophistication, and numerous variations of Defendant's fraud scheme, which ranged from bogus insurance products called "performance bonds" to purported "T-strip investments"—all of which he used to lure unsuspecting victims. Over the years, Defendant had countless opportunities to abandon his partner and make amends. He was sued at least a dozen times in this District and others. He was not deterred. And when the FBI approached Defendant in an effort to encourage him to take responsibility (and cooperate against McConley) pre-indictment, he refused. Defendant is as remorseless today as he was then. Defendant's history and characteristics do not support leniency.

> C. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; general deterrence; and specific deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B), (C).**

The Government has already cited "the critical deterrent value of imprisoning serious white collar criminals[.]" Martin, 455 F.3d at 1240 (citation omitted; emphasis added). Defendant's outright defiance and dishonesty throughout this case show that he is a potential recidivist. Defendant, who maintains he has done nothing wrong, was setting up various film financing scams well **before** the instant offense (see, e.g., GX 1-404-9). Even after Defendant was indicted, he was still shamelessly luring in investors through his WeatherVane Productions website (Gov't Resp. [ECF No. 80] at 2). The Court saw how Van Eman treated his victims with total disdain in his e-mails to his partners. At trial, he attempted to fool the jury the same way he did the investors— through "brazen lies" and "half-logical explanations." July 13, 2022, Jack Viertel E-mail to

Probation Officer. The oath did not dissuade him. Only a significant prison sentence will deter Defendant from committing more fraud. The public should be protected from this con artist.

Additionally, a long sentence in this case will send a strong message, not only to the victims of this offense, not only to the movie industry, but to the many would-be Ponzi schemers who intend to use South Florida as a base of operations.

### D. The applicable Sentencing Guidelines and unwarranted disparities. See 18 U.S.C. § 3553(a)(4), (6).

Finally, as noted, Defendant's arguments that his co-defendants' sentences should in any way guide the Court are unavailing. Section 3553(a)(6) concerns itself only with those sentencing disparities that are "unwarranted." Here, Defendant's conduct was on par with McConley's from 2013 through 2019. They were definitional "partners in crime." Today, Defendant's conduct is more offensive than McConley's because he never stopped lying about it. The Guidelines, as well as the statutory factors, account for that disparity. And Congress said the Court must consider the Guidelines range under Section 3553; in fact, it is a separate factor unto itself. 18 U.S.C. § 3553(a)(4). Here, the Guidelines operate to distinguish the defendants' roles—where Rafael was sentenced as a "minimal participant," Defendant will be sentenced as a "leader" and "organizer" of the scheme he masterminded.

Finally, just as the Court looked at the sentences imposed on the bankers in the Rothstein case in determining Rafael's sentence, it should likewise consider the 30-, 40-, and 50-year sentences imposed on the orchestrators of large-scale Ponzi schemes prosecuted in this District. It cannot be said that a sentence between 21 and 27 years is out of step with the punishments imposed in those cases. If anything, it is comparatively lenient.

## CONCLUSION

The Court should deny Defendant's motion for a downward variance, and impose a Guidelines sentence that recognizes (1) the damage inflicted by his fraud; and (2) his total lack of remorse or regret.

                                            Respectfully submitted,

                                            JUAN ANTONIO GONZALEZ
                                            UNITED STATES ATTORNEY

By:    */s/ Christopher B. Browne*
        Assistant United States Attorney
        Fla. Bar No. 91337
        Yisel Valdes
        Assistant United States Attorney
        Special Fla. Bar No. A5502330
        99 NE 4th Street, 4th Floor
        Miami, FL 33132
        Phone: (305) 961-9419
        christopher.browne@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 18, 2022, the foregoing document was filed with the Clerk of the Court using CM/ECF.

                                            */s/ Christopher Browne*
                                            Assistant United States Attorney